558 F.2d 75
 10 ERC 1216, 7 Envtl. L. Rep. 20,512
 BRITISH AIRWAYS BOARD and Compagnie Nationale Air France,
Plaintiffs-Appellees,
v.
The PORT AUTHORITY OF NEW YORK and New Jersey, William J.
Ronan, W. Paul Stillman, James G. Hellmuth, Victor R.
Yanitelly, Milton A. Gilbert, James C. Kellogg, III, Alan
Sagner, Joseph F. Cullman, III, et al., Defendants- Appellants.
 No. 1403, Docket 77-7237.
 United States Court of Appeals,
Second Circuit.
 Argued June 1, 1977.
Decided June 14, 1977.
 
 Patrick J. Falvey, Gen. Counsel, The Port Authority of N.Y., and N.J., New York City (Joseph Lesser, Isobel Muirhead, Arthur Berg, Vigdor D. Bernstein, Benjamin R. DeCosta, Sholem Friedman, New York City, of counsel), for defendants-appellants.
 Peter J. Nickles, Washington, D. C. (William C. Clarke, New York City, William H. Allen, John M. Clear and Covington & Burling, Washington, D. C., of counsel), for plaintiff-appellee British Airways.
 Stanley Godofsky, New York City (John A. Wells, Stephen R. Froling, Timothy R. Cappel and Rogers & Wells, New York City, of counsel), for plaintiff-appellee Air France.
 Geoffrey M. Kalmus, New York City (Charlotte M. Fischman and Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, and John F. Hellegers, Environmental Defense Fund, Inc., Washington, D. C., of counsel), for amici curiae Friends of the Earth, Inc., Metro Suburban Aircraft Noise Ass'n, Inc., Howard Beach Ass'n, Inc., The Hudson River Valley Council, The Emergency Coalition to Stop the SST, Joseph R. Lewis and Carol Berman.
 James R. Moorman, Acting Asst. Atty. Gen., Washington, D. C. (Edmund B. Clark and Peter R. Steenland, Jr., Washington, D. C., of counsel), filed a brief for the U. S., amicus curiae.
 Henry L. Diamond, Washington, D. C. (Beveridge, Fairbanks & Diamond, Washington, D. C., of counsel), filed a brief for Government of the United Kingdom, amicus curiae.
 Charles G. Goodell, Washington, D. C. (Hydeman, Mason & Goodell, Washington, D. C., of counsel), filed a brief for Government of France, amicus curiae.
 Louis J. Lefkowitz, Atty. Gen. of State of N.Y., New York City (Samuel A. Hirshowitz, First Asst. Atty. Gen., Philip Weinberg, John F. Shea, III, New York City, of counsel), filed a brief for State of N.Y., amicus curiae.
 Evelle J. Younger, Atty. Gen. of State of Cal., Sacramento, Cal. (Larry C. King, Deputy Atty. Gen., Sacramento, Cal., of counsel), filed a brief for State of Cal., amicus curiae.
 William D. Denson, New York City, filed a brief for amici curiae Town of Hempstead, Village of Lawrence, Village of Cedarhurst, Village of Atlantic Beach, Robert F. Check, Mona Gottesman and Herbert Warshavsky.
 Before KAUFMAN, Chief Judge, and MANSFIELD and VAN GRAAFEILAND, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 Fifty years ago almost to the day from the argument in this case Charles Lindbergh traversed the Atlantic to Paris aboard the Spirit of St. Louis in an astonishing 33 1/2 hours, an achievement that was hailed around the world. Today, as the result of an expensive joint venture, France and Britain offer a return voyage of only one-tenth that duration. Unfortunately, instead of engendering closer ties, the Ango-French Concorde has thrown traditionally staunch allies into legal warfare over the future of supersonic aviation. As in so many cases in which a political solution is preferable, the parties find themselves in a court of law.
 
 
 2
 Our task is to review the judgment of the district court dissolving the Port Authority's temporary ban on SST flights at John F. Kennedy International Airport. The court below found that the Secretary of Transportation, in ordering a 16 month operational test of the Concorde, had preempted the Authority's power to abate, through its temporary ban, the noise generated by the Concorde during landings and take-offs. We disagree, and believe that Congress provided for the promulgation by airport proprietors of reasonable regulations to establish acceptable noise levels for the airfield and its environs. Accordingly, we reverse. We also remand for an evidentiary hearing on the reasonableness of the Port Authority's 13 month ban in accordance with the views expressed in this opinion.
 
 I.
 
 3
 A brief summary of the facts is indispensable for an understanding of the legal issues before us.
 
 
 4
 The Port Authority's tradition of noise regulation. The rapid development of commercial aviation after the Second World War engendered, for the first time, an urgent need to protect neighbors of thriving metropolitan airports from the deafening noise of overflying aircraft. Moreover, as experience with the still greater din of military jets accumulated, far-sighted community planners began to anticipate the need to accommodate commercial jet aviation with the legitimate yearning of city dwellers for a livable environment.
 
 
 5
 The Port Authority of New York and New Jersey, operator of New York's Kennedy International Airport, was one of the first to recognize the environmental challenge of civil jet aviation. In 1951, the Authority adopted a regulation, still in force, prohibiting any jet from landing or taking off without permission at any facility operated by the Authority. The purpose of this regulation was to make it clear to the developers of the first commercial jets that elimination of excessive noise was as important an element of design as safety or speed. This message was driven home in the early 1950s, when an initial model of the British-made DeHavilland Comet was denied permission to land at New York International Airport because its noise level was deemed intolerable to the surrounding communities. Shortly thereafter the Port Authority similarly denied landing permission to Boeing's prototype jet transport.
 
 
 6
 By 1955, the Port Authority recognized that the imminent jet age would require more than an ad hoc program of noise control. Accordingly, a consulting firm was retained and charged with evolving a measure of noise that would reflect subjective reactions to the irritating high-pitched whine of jet airplanes. Careful study revealed that an ordinary person heard 112 PNdB (perceived noise in decibels) emitted by a jet as substantially equivalent to the sound produced by the standard DC-6B propeller aircraft. This single-event noise level, as registered at selected sites, was adopted as the permissible maximum. After thorough flight-testing, and development of take-off and landing procedures that substantially reduced noise, the Comet and the Boeing 707 were accorded landing rights. Thereafter, until the Port Authority's resolution of March 11, 1976, which banned the supersonic transport "Concorde" from Kennedy Airport and spawned this litigation, the 112 PNdB standard was uniformly applied to all aircraft seeking landing permission at Kennedy.
 
 
 7
 The Port Authority justifiably takes pride in its tradition of noise regulation. Over the years it has consistently welcomed each advance in commercial aviation, provided progress was not achieved by sacrificing the well-being of the hundreds of thousands of people who reside in the vicinity of Kennedy Airport. The Authority's firmness, coupled with the implicit promise that advanced aircraft would be permitted to land if they satisfied reasonable noise regulations, has undoubtedly contributed greatly over the years to the development of ever-quieter jet planes.
 
 
 8
 The Concorde. Britain and France decided in 1962 to embark upon a dramatic joint venture: the development of a supersonic jet airliner, the Concorde. This ambitious enterprise was more than an economic investment. The Concorde was the response of two proud nations to the growing American domination of the international aircraft market and a symbol of the era of European cooperation that then appeared at its zenith.
 
 
 9
 The developers of the Concorde were well aware of the importance of minimizing noise. Their hope was to develop an engine that would produce no more sound than the noisiest of the subsonic planes. Accomplishment of this goal would be a formidable technological achievement, because the engines of the Concorde required an enormous potential thrust in order to drive the aircraft at speeds faster than sound. The English and French spent more than $100 million just to moderate the noise of the Concorde, and over a period of 13 years a total of almost $3 billion has been expended on the plane's development.
 
 
 10
 The United Kingdom and France have thus staked immense capital and even greater national pride on the success of the Concorde. This success, our allies maintain, must remain an idle dream unless the supersonic airliner is permitted to land in New York, the principal gateway between Europe and the United States. The operators of the Concorde urge that their plane can meet the 112 PNdB standard that the Port Authority applies to other aircraft and desire merely to prove, by actual experience, that the airliner will not cause an intolerable deterioration in the noise environment around Kennedy Airport.
 
 
 11
 The Coleman decision. The Concorde was ready to commence commercial operations in 1975. In late summer British Airways and Air France applied to the Federal Aviation Administration for an amendment of their operations specifications to permit the use of the SST in transatlantic service to the United States. See 14 C.F.R. § 129. Approval of the airlines' applications could hardly have been entrusted to the routine processes of the FAA: the potential promise of supersonic jet aviation, the special importance of the Concorde to two of America's closest allies, and the serious environmental questions raised by the aircraft, all required a decision by the cabinet officer responsible for transportation, on the basis of a carefully prepared environmental impact statement. Secretary William T. Coleman's decision is the very paragon of a clear and considered administrative action.
 
 
 12
 Secretary Coleman directed the Federal Aviation Administration to order provisional amendment of the airlines' operations specifications to permit each carrier to conduct up to two Concorde flights daily into John F. Kennedy International Airport and one per day into Dulles International Airport. These amendments were not to be effective beyond 16 months from the commencement of commercial service and could be revoked immediately in the event of an emergency or at any time on four months notice. Secretary Coleman, in addition, provided a detailed scheme for regulation of the Concorde's noise: the plane was required to observe a 10 p. m. to 7 a. m. curfew and to abide by noise abatement procedures, including a sharp left turn upon takeoff, as prescribed by the FAA. The operations specifications were amended in accordance with the Secretary's order on April 2, 1976.
 
 
 13
 In Secretary Coleman's view, a testing period of actual Concorde operations was an essential prelude to the final decision on the aircraft's acceptability in the United States. The Concorde, whatever imperfections it may have, is a potentially revolutionary development in transportation. Only the knowledge concerning the demand for supersonic air transportation that comes from testing the product will tell us whether the revolutionary possibilities are likely to be realized and whether the massive investment in research required to overcome the plane's present environmental deficiencies is justified. Moreover, the community reaction to Concorde noise is a subjective matter that cannot be predicted accurately without actual Concorde operations. Thus, the very dimensions of the most significant environmental drawback of the Concorde are impossible to determine without an adequate test.
 
 
 14
 The 16-month testing period approved by Secretary Coleman is important not only to assure that the federal decision on the Concorde will be a fully informed one; it provides in addition a critical assurance to Britain and France that the United States is determined to afford the Concorde a fair trial. Secretary Coleman emphasized the massive commitment of their treasury and prestige that the British and French have invested in the Concorde, as well as the economic importance to these hard-pressed nations of reacquiring a competitive position in the world aviation industry. Our decision on the SST, a matter of such vital importance to two of our closest allies, is certain to affect the structure of our foreign policy. Indeed, the essential treaty arrangements for international aviation may be undermined by a determination on the Concorde that Britain and France perceive to be unjust, as they surely would a ban without a fair trial.
 
 
 15
 In ordering that a test be permitted at Kennedy Airport, Secretary Coleman considered very carefully the impact of the limited Concorde landings on the airport's neighbors. He recognized that the Concorde differs from other jets because the sound produced by its engines is of a relatively low pitch. The plane's deep rumble causes minor structural rattling and an increased likelihood of penetration of the sound into buildings. Coleman concluded, however, on the basis of a comprehensive survey of the evidence, that "these vibrations do not present any danger of structural damage and little possibility of annoyance." The principal difference between the Concorde and subsonic aircraft, we are told, is that the SST's sound carries farther. Secretary Coleman found, however, that the addition of eight Concorde flights a day at Kennedy, under the restrictions imposed by his order, would have but a marginal impact on the noise environment near the airport. The Secretary concluded,
 
 
 16
 Although I am deeply concerned about the additional irritation that these few demonstration flights may cause for some individuals . . ., I believe that this environmental cost is outweighed by the benefits that will accrue to the American people from the demonstration.
 
 
 17
 Notwithstanding this careful consideration of the interests of the people near Kennedy Airport, and notwithstanding the noise regulations of the Secretary's order, which were designed to afford protection to the airport's neighbors, Secretary Coleman explicitly recognized the right of the Port Authority to refuse landing rights to the Concorde:
 
 
 18
 The FAA is the proprietor of Dulles and it is therefore part of my decision today to direct the Federal Aviation Administrator to permit one Concorde flight per day at Dulles by each carrier under the conditions noted. The situation with respect to JFK may be complicated by the fact that under federal policy that has hitherto prevailed a local airport proprietor has had authority under certain circumstances to refuse landing rights. If for any legitimate and legally binding reason it should turn out that the JFK part of the demonstration could not go forward and no one has indicated to me any such final disposition by JFK's proprietor that would obviously be extremely unfortunate and would greatly diminish, but in my opinion it would not destroy, the validity of the demonstration.
 
 
 19
 Secretary Coleman, his successor Brock Adams, and President Carter have all repeatedly avowed that the Coleman order did not preempt the Port Authority's right to exclude the Concorde pursuant to a reasonable, nondiscriminatory noise regulation. The United States has reaffirmed this position in its amicus brief to this Court.
 
 
 20
 The Port Authority ban on the Concorde. The Port Authority did not apply its 112 PNdB rule to the Concorde. Rather, it raised what it considered significant questions regarding the adequacy of its existing noise rule to regulate special characteristics of the SST's low frequency sound. Thus, the Port Authority considered the adverse environmental effects of the Concorde's low-pitched noise worthy of more study. And, the Port Authority expressed concern that the total area exposed to the rumble of Concorde flights would be considerably greater than the equivalent area for subsonic aircraft.
 
 
 21
 The Port Authority agreed with Secretary Coleman that the subjective reaction of people exposed to Concorde noise needed further inquiry under actual operating conditions but declared that further evidence was needed before the large number of people living near John F. Kennedy Airport were exposed to Concorde noise. Accordingly, on March 11, 1976, the Concorde was banned from Kennedy pending a six-month study of operating experience at Dulles in the United States, and Charles DeGaulle and Heathrow Airports in Europe. The Concorde began commercial flights to Washington in May, 1976, over 13 months ago. The Authority has not concluded its inquiry and, accordingly, has not considered what noise regulation would be appropriate for the special characteristics of the Concorde assuming that the existing and well-established 112 PNdB rule were found inadequate.
 
 
 22
 Air France and British Airways commenced this action to enjoin the Port Authority ban on March 17, 1976. The airlines urge that the Authority's action violates U.S. treaty commitments, interferes with the foreign affairs power of the federal government, and is preempted by Secretary Coleman's authorization of Concorde landings at JFK and provision of detailed regulations for noise control at the airport. These contentions form the grounds for the summary judgment motion Judge Pollack granted and that we are now called upon to review. The airlines also maintain that the Port Authority's ban is discriminatory and an undue burden on commerce. This allegation, however, which we understand the United States to support, was excluded as a ground for the summary judgment.
 
 II.
 
 23
 We need not tarry long over the issue that heretofore has occupied center stage in this litigation. We believe the ground for Judge Pollack's grant of summary judgment, that Secretary Coleman's order preempted the conflicting exercise of power by the Port Authority, is simply untenable and erroneous. Accordingly, we will reverse.
 
 
 24
 In response to our request, the United States filed an amicus brief in which it urged that Secretary Coleman's order was never intended to deprive the Port Authority of the right to condition utilization of the facilities at JFK on the Concorde's compliance with reasonable noise regulations. The Government, indeed, went further, and denied that existing legislation authorized the Executive under any circumstances to preempt airport proprietors from promulgating their own noise regulations.
 
 
 25
 This conclusive statement of the United States position confirms our independent assessment of the public record. Secretary Coleman's decision explicitly indicated that the Concorde's right to land at Kennedy depended upon the voluntary cooperation of the Port Authority, though, of course, the Secretary did not hesitate to direct Dulles, a federally operated facility, to afford landing rights to the Anglo-French plane. Any uncertainty that might have remained after Coleman's decision was dissipated by the Secretary the following week, when he told the House Committee on Public Works and Transportation that an airport proprietor's imposition of a "non-discriminatory" ban on supersonic transports would not be preempted by FAA action, as long as it did not constitute an "unreasonable burden on interstate and foreign commerce." Aircraft Noise Policy Hearings, 94th Cong. 2d Sess., at 705 (1975-76). Secretary Coleman reiterated the vitality of this "federal policy" again two weeks after the Port Authority promulgated its "temporary" ban on the Concorde. It is now evident that this approach to noise regulation has survived the change of administration. President Carter and his present Transportation Secretary Brock Adams have made it abundantly clear, in the amicus brief and elsewhere, that they have continued the traditional policy of refusing to preempt the local airport operator's responsibility for establishing permissible levels of noise. In view of the repeated disavowal by federal officials of any attempt to preempt the Port Authority's right to subject the Concorde to reasonable noise regulations, we are compelled to hold the Secretary's order did not preclude the exercise of power by the Authority.
 
 III.
 
 26
 Since the reasonableness of the Port Authority's delay has been raised for the first time by the United States as amicus on appeal, we cannot appropriately decide the issue. Basic tenets of fairness require that a federal appellate court should not consider an issue involving questions of fact not resolved below. It is "essential . . . that parties may have the opportunity to offer all the evidence they believe relevant to the issues . . .", Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) quoting with approval Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941). We are particularly reluctant to affirm the District Court's grant of summary judgment on another ground especially one not advanced by the parties where the effect is to deprive the appellant from disputing facts material to that claim. Fruge's Heirs v. Blood Services, 506 F.2d 841, 844 (5th Cir. 1975). As we noted recently in Mariash v. Morrill, 496 F.2d 1138, 1145 (2d Cir. 1974) on appeal we will not be coaxed into acting without a proper adversary foundation by the "unilateral and gratuitous assertion" of a claim to summary judgment that neither side pressed in the district court.
 
 
 27
 We do believe, however, that the government has raised an important and viable point. Implicit in the federal scheme of noise regulation, which accords to local airport proprietors the critical responsibility for controlling permissible noise levels in the vicinity of their airports, is the assumption that this responsibility will be exercised in a fair, reasonable and nondiscriminatory manner.[1] Although 13 months have already elapsed since the commencement of commercial Concorde operations at Dulles, we cannot on the state of this record find that this delay is unreasonable. The Port Authority desires an evidentiary hearing to submit facts justifying this delay.
 
 
 28
 A. The Regulatory Scheme.
 
 
 29
 The regulation of excessive aircraft noise has traditionally been a cooperative enterprise, in which both federal authorities and local airport proprietors play an important part. Of course, legitimate concern for safe and efficient air transportation requires that exclusive control of airspace management be concentrated at the national level. See City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). The repeated efforts of local communities to control the noise of overflying jets have been consistently frustrated by application of the doctrine of federal preemption of regulations concerning planes in flight. See Allegheny Airlines v. Village of Cedarhurst, 238 F.2d 812 (2d Cir. 1956); American Airlines v. Town of Hempstead, 398 F.2d 369 (2d Cir. 1968), cert. denied, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969).
 
 
 30
 It is understandable that the numerous localities in the vicinity of major airports cannot be permitted an independent role in controlling the noise of passing aircraft. The likelihood of multiple, inconsistent rules would be a dagger pointed at the heart of commerce and the rule applied might come literally to depend on which way the wind was blowing. The task of protecting the local population from airport noise has, accordingly, fallen to the agency, usually of local government, charged with operating the airport. Air Transport Ass'n v. Crotti, 389 F.Supp. 58 (N.D.Cal.1975) (3-judge court); Nat'l Aviation v. City of Hayward, 418 F.Supp. 417 (N.D.Cal.1976). Indeed, since the operator controls the location of the facility, acquires the property and air easements and is often able to assure compatible land use, he is liable for compensable takings by low-flying aircraft, Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). The right of the proprietor to limit his liability by restricting the use of his airport has been thought a corollary of this principle. It is perhaps more important, however, that the inherently local aspect of noise control can be most effectively left to the operator, as the unitary local authority who controls airport access. It has always seemed fair to assume that the operator will act in a rational manner in weighing the commercial benefits of proposed service against its costs, both economic and political.
 
 
 31
 Congress repeatedly has declined to alter this cooperative scheme.[2] Thus, although the Federal Aviation Act was amended in 1968 to stimulate the national effort to reduce excessive aircraft noise by requiring the Administrator to "prescribe . . . such (rules and) regulations as (he) may find necessary to provide for the control and abatement of aircraft noise . . . ." 49 U.S.C. § 1431(b)(1), the legislative history clearly states that the statute was merely intended to strengthen the FAA's regulatory role within the area already totally preempted control of flights through navigable airspace. The Senate Report accordingly concludes that
 
 
 32
 (the) proposed legislation will not affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.
 
 
 33
 S.Rep. No. 1353, 90th Cong., 2d Sess. 7 (1968), U.S.Code Cong. & Admin.News 1968, pp. 2688, 2694 (citing letter of Secretary, Department of Transportation). Similar support for this historic relationship between the federal and local authorities is again found in the House and Senate Reports accompanying the 1972 amendments to the Noise Control Act, see H.R.Rep. No. 92-842, 92d Cong., 2d Sess. 10 (1972); S.Rep. No. 92-1160, 92nd Cong., 2d Sess. 10-11 (1972), U.S.Code Cong. & Admin.News 1972, p. 4655.
 
 
 34
 In light of this clear expression of legislative intent, the Supreme Court has refrained from holding that Congress has occupied the field of noise regulation to the exclusion of airport proprietors. City of Burbank, supra,411 U.S. at 635 n.14, 93 S.Ct. 1854. The FAA after thorough study has wholeheartedly endorsed a continued major role for airport proprietors in the development of noise abatement programs consonant with local conditions. See Dep't of Transportation, Aviation Noise Abatement Policy (Nov. 18, 1976). And, we interpret the Government's amicus brief in the case before us to be premised on the view that Congress has, by giving explicit sanction to this pattern of regulations, implicitly denied the executive the power to preempt operator-imposed noise restrictions, regardless of the statutory source invoked to support federal administrative action.
 
 
 35
 B. Local Regulation Must Be Reasonable.
 
 
 36
 ( i) Constitutional and Statutory Bases. We believe the scope of the Port Authority's power as an airport proprietor to impose use restrictions based on noise considerations is defined by the limited role Congress reserved for it in the national scheme we have briefly sketched. The proper domain of the operator is the "issu(ance of regulations) or establish(ment of requirements) as to the permissible level of noise which can be created by aircraft using the airport." S.Rep. No. 1353, supra at 6, U.S.Code Cong. & Admin.News 1968, p. 2694. It is clear to us that the Port Authority is vested only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs. Any other conduct by an airport proprietor would frustrate the statutory scheme and unconstitutionally burden the commerce Congress sought to foster.
 
 
 37
 The Supreme Court this Term held that localities may require federal licensees to observe conservation and environmental protection regulations so long as these measures are reasonable and nondiscriminatory. Douglas v. Seacoast Products, Inc., 431 U.S. 265, ---, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). Douglas was concerned with an ordinance of the Commonwealth of Virginia that purported, apparently on environmental grounds, to ban a non-resident, but federally certified, company from certain commercial fishing in Chesapeake Bay. The challenged regulation, like the one before us, concerned a field Congress has traditionally left to State and local government. The Court instructed us again, however, that the legitimate local power had to be exercised in a nondiscriminatory fashion and in conformity with federal law. Congress has left room only for local action that advances and is consistent with federal policy; other, noncomplementary exercises of local prerogative are forbidden.[3]
 
 
 38
 We find the analogy to the instant case striking. Congress has reserved to proprietors the authority to enact reasonable noise regulations, as an exercise of ownership rights in the airport, because they are in a better position to assure the public weal. Under this scheme, foreign commercial airlines are not immunized from the operation of the normal incidents of the local power. But pervading this strategy of national-local cooperation, and inherent in it, is the understanding and, indeed, necessity that the local body will not unreasonably hinder the accomplishment of legitimate national goals. See also Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); Toye Bros. Yellow Cab Co. v. Irby, 437 F.2d 806 (5th Cir. 1971).
 
 
 39
 Counsel for the Port Authority clearly conceded in argument before us that the Port Authority's power to set noise rules was subject to the proviso that they be reasonable. Thus, in response to Judge Van Graafeiland's question concerning the scope of the Port Authority's asserted jurisdiction, Mr. Falvey replied:
 
 
 40
 The Port Authority has the right to decide, on the basis of reasonable, nondiscriminatory regulations, whether or not to accept types of aircraft at its airports. (Emphasis added.)
 
 
 41
 We assume that the Port Authority is compelled to this view, not only by the considerations we have outlined above, but by its compact with the Secretary of Transportation as well, that JFK would be "available for public use on fair and reasonable terms and without unjust discrimination". 49 U.S.C. § 1718(1). See City of Dallas v. Southwest Airlines Co., 494 F.2d 773 (5th Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974); Aircraft Owners & Pilots Assn. v. Port Authority, 305 F.Supp. 93 (E.D.N.Y.1969).
 
 
 42
 (ii) Treaties. Our conclusion that the Port Authority may ban supersonic aircraft only pursuant to reasonable noise regulations is further supported by a consideration of United States treaty obligations. In his prescient opinion, Secretary Coleman warned that "total ban of the Concorde at this time, without giving it any chance to prove itself, would conceivably be attacked as discriminatory." Decision at 11-12. Of course, all agree that equal, nondiscriminatory treatment of domestic and foreign air commerce is the touchstone of the complex network of agreements regulating international aeronautical traffic of which the United States is a major beneficiary. The bilateral compacts between this country, Great Britain and France indicate that each signatory will subject the air carriers of the other to evenly-applied "laws and regulations." See United States-France Air Transport Services Agreement, Art. V., 61 Stat. 3445, T.I.A.S. No. 1679 (March 27, 1947); Bermuda Agreement, Art. 5, 60 Stat. 1499, T.I.A.S. No. 1507 (Feb. 11, 1946). See also Convention on International Civil Aviation (Chicago Convention), 61 Stat. 1180, T.I.A.S. No. 1591 (August 9, 1946).
 
 
 43
 The airlines contend that the Port Authority's ban on Concorde operations is not a valid and enforceable "regulation" under the bilateral agreements. They urge that the Authority's action is in fact not a rule of general application, but an ad hoc measure, directed solely at them, and providing no opportunity for the airlines to show the Concorde is environmentally acceptable. We agree, of course, that the failure of a local airport proprietor to promulgate an even-handed noise regulation for application to both domestic and foreign carriers would raise a significant likelihood of the type of "discrimination" that is forbidden under binding treaty commitments. But this is not to say that foreign airlines cannot be subjected to any local regulations, nor is it to say that local government must blind itself to significant differences in the noise characteristics of aircraft, merely because they are operated by foreign carriers. Cf. Guaranty Trust Co. v. United States, 304 U.S. 126, 143, 58 S.Ct. 785, 82 L.Ed. 1224 (1937). Indeed, British and French airlines have complied with JFK's rule excluding jet aircraft producing more than 112 PNdB for nearly two decades, apparently without complaint.
 
 
 44
 The issue, then, is whether the Concorde's concededly revolutionary technology justifies a temporary ban of operations for study of the advisability of applying to it the noise regulations generally applicable to jet aircraft and for consideration, if necessary, of new and reasonable regulations tailored to the special noise characteristics of the SST. The reasonableness of the Port Authority's ban or the study itself is not before us. Accordingly we are not called upon to decide this sensitive question.[4] We are compelled to note, however, that, should the Port Authority's action be found arbitrary and capricious, a serious question would be raised concerning its compatibility with American treaty arrangements. The delicate framework of international understanding that makes possible the flourishing of transoceanic air travel has already been rent by the Concorde controversy; it is manifestly imperative that noise regulations, promulgated by those who, like the Port Authority, operate our international airports, withstand all allegations of arbitrariness or discrimination.
 
 IV.
 
 45
 Since the Government concedes that it has not, and under its view of existing legislation, could not preempt the field of airport noise regulation, we are not deciding whether the SST may land at Kennedy Airport. However, there remains the question of whether the 13 month delay by the Port Authority in promulgating reasonable noise regulations applicable to supersonic aircraft is so excessive as to constitute unfair discrimination and an undue burden on commerce.
 
 
 46
 We accordingly direct that the district court on remand proceed to conduct an evidentiary hearing on the reasonableness of the Port Authority's thirteen month ban on Concorde landings at JFK.
 
 
 47
 In the event that the evidence does not support a finding of unreasonable delay, we nevertheless believe it is in the interest of all concerned that this interminable strife be brought to an end. Accordingly, we urge the Port Authority to conclude its study and fix reasonable noise standards with dispatch. We recognize, of course, the pressures that have been brought to bear on the Authority by the interested governments, the State of New York, and segments of the public. We are confident, however, that the Authority will continue its tradition of even-handedness and leadership in its effort to reconcile aviation progress with environmental concerns. More delay can only exacerbate the pulling and tugging which accompany hard decisions.
 
 
 
 [1]
 It is highly questionable that a private party can seek injunctive relief against the Port Authority in an article 78 proceeding in state court. See New York City Chapter of National Electrical Contractors Assn. v. Fabber, 73 Misc.2d 859, 343 N.Y.S.2d 33 (Sup.Ct.), aff'd, 41 A.D.2d 821, 343 N.Y.S.2d 558 (1st Dep't.1973). The Port Authority's charter provides that it can be enjoined without its consent only in an action instituted by the Attorney General of New York or New Jersey. See L.1950, ch. 301, § 5, McK.Unconsol.Laws, Sec. 7105. Even if the airlines could bring such an action in state court, our jurisdiction would not be defeated. See Douglas v. Seacoast Products, 431 U.S. 271, 265 n.4, 97 S.Ct. 1740, 52 L.Ed.2d 304
 
 
 [2]
 Under the Commerce Clause, Congress has the power, in order to promote a nationwide transportation system and to control interstate and foreign air traffic flow, to dictate what aircraft should be permitted to land and take-off from airports. See City of Burbank v. Lockheed Air Terminal, supra. But it is manifest from our scheme of aviation management that Congress has consciously committed to airport owners the responsibility of determining permissible levels of noise for the facility and its environs. This delegation of authority, in a field otherwise entirely occupied by the federal government, implies no general restriction on federal power. Instead, it is plain that State and local bodies have been made partners with the federal government and the aeronautics industry in a nationwide effort to control airport noise
 
 
 [3]
 Indeed, the Commerce Clause of its own force prohibits local regulations that exceed limits necessary to vindicate a recognized state interest. See Florida Avocado Growers v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); Dean Milk Co. v. Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951). The law seems clear that any Port Authority regulation pertaining to the Concorde must reasonably and nondiscriminatorily advance the end of aircraft noise abatement for airport neighbors
 
 
 [4]
 The amicus brief of the United States did not address the effect of existing treaty obligations on this case because, as the government stated, there were pending discussions concerning renewal of the bilateral aviation compact between the United States and the United Kingdom. It has been reported that the controversy over the Concorde has contributed significantly to the difficulties encountered in renegotiating the Bermuda Agreement