**NATIONAL BUSINESS AVIATION AS- SOCIATION, INC. and General Avia- tion Manufacturers Association, Plaintiffs,**

v.

**CITY OF NAPLES AIRPORT AUTHORITY, Defendant.**

**No. 2:00–CV–572–FTM–29DNF.**

United States District Court, M.D. Florida, Fort Myers Division.

Aug. 8, 2001.

---

Theodore Lawton Tripp, Jr., Garvin & Tripp, Ft. Myers, FL, Frank Costello, Zuckerts, Scoutt & Rasenberger, LLP, Washington, DC, for Plaintiff.

David H. Quigley, Akin, Gump, Hauer & Feld, Washington, DC, Louis X. Amato, Naples, FL, for Defendant.

## ORDER

PRESNELL, District Judge.

This cause came on for consideration after oral argument on cross-motions for summary judgment filed by the Plaintiffs (Doc. 32, filed June 18, 2001) and the Defendant (Doc. 38, filed June 18, 2001). Because they address similar issues—primarily pre-emption and alleged violations of the Commerce Clause—the Court will address both motions in a single order.

### I. Factual Background

The Defendant, the Naples Aviation Authority ("the Authority") is an independent agency established by the Florida Legislature. The Authority operates the Naples Municipal Airport. The Plaintiffs—the National Business Aviation Association, Inc. and the General Aviation Manufacturers Association—are two trade groups representing members of the business aviation community and the aviation manufacturing community, respectively. For simplicity, the Court will refer to the Plaintiffs jointly by the acronym— "NBAA"—of the first-named plaintiff. At least one member of the NBAA operates an aircraft of the type at issue in this case (Stage 2 [1]) at the Naples Municipal Air-

---

1. The Federal Aviation Administration rates aircraft based on the noise they produce; the aircraft at issue in this suit fall in between the noisiest category (Stage 1) and the quietest (Stage 3). By law, all Stage 1 aircraft and those Stage 2 aircraft weighing more than 75,000 pounds are already banned from oper-

port, and several others provide services (fuel, repairs, and the like) for Stage 2 aircraft there. The instant suit is a response to the Authority's efforts to ban Stage 2 aircraft from operating at the Naples Municipal Airport.

Over the years, the Authority has implemented a variety of measures intended to reduce aircraft noise or its effects on Naples residents, including encouraging quieter operating procedures by jets landing at the airport, preferential use of runways to reduce flight operations over residents, and a ban on nighttime "runups"—racing of aircraft engines during maintenance and repair operations. Still, noise complaints persist around the Naples Municipal Airport.

In an effort to further reduce the noise associated with the airport, the Authority has opted to ban the remaining Stage 2 jet aircraft—*i.e.*, those under 75,000 pounds—from operating at the Naples Municipal Airport as of August 30, 2001.[2] The Authority based this decision at least in part on concerns about noise impact on areas that experience an average of 60 to 65 decibels (dB) across the course of a day.[3] For this and other reasons, the NBAA contends that the ban violates both the Supremacy Clause and the Commerce Clause of the United States Constitution. Because the NBAA raises a federal question, this Court has jurisdiction over the dispute pursuant to 28 U.S.C. § 1331.

ating at Naples Municipal Airport, among others. *See* 49 U.S.C. § 47528(a).

**2.** The ban was originally to take effect on January 1, 2001, but the Authority has delayed enforcement for various reasons, most recently to allow this Court to decide the issues raised by the instant suit.

**3.** As more fully described below, airport operators map out the average noise exposure of areas around their airports; such maps take

## II. *Legal Standards*

### A. **Summary Judgment**

A party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). Summary judgment is mandated when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The burden on the non-moving party is not a heavy one; that party must simply show "specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay

the form of contour maps, with each contour line representing the point at which the day-night average sound level ("DNL")—that is, the amount of noise experienced by a particular area, averaged across the course of a day (including a 10-decibel "penalty" for nighttime noise)—reaches a certain threshold. Thus, the areas considered by the Authority in imposing the Stage 2 ban included the area between the 65 dB DNL contour and the 60 dB DNL contour.

Kane, *Federal Practice and Procedure* (1998), § 2727 (citing cases). It is the obligation of the nonmoving party, however, not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment: Rule 56 "requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (internal quotations and citation omitted). *See also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) ("The court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact."). In considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in favor of the non-moving party. *HCA Health Serv. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir.2001).

In *Earley v. Champion International Corp.*, 907 F.2d 1077 (11th Cir.1990), the court recognized that the summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Id.* at 1080 (citing *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2554–55). The court further stated that if a plaintiff has failed to carry his burden of proof by offering evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 1080–1081. In other words, to avoid summary judgment, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## B. Pre-emption

 Article VI of the Constitution of the United States provides, in part, that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under Authority of the United States, shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause, as it is popularly known, establishes that state law may not override or interfere with federal law—a premise that lies at the heart of pre-emption doctrine. *Myrick v. Freuhauf Corp.*, 13 F.3d 1516, 1519 (11th Cir.1994), criticized on other grounds in *Freightliner Corp. v. Myrick*, 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). According to the Supreme Court, pre-emption may occur in one of three ways:

> First, Congress can define explicitly the extent to which its enactments pre-empt state law.... Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it".... Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements.

*Id.* (quoting *English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990)). The two types of implied pre-emption referred to above are commonly referred to as "field pre-emption" and "conflict pre-emption," respectively. *See Gade v. National Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992). The existence of an express pre-emption clause does not necessarily preclude either type of implied pre-emption. *Freightliner Corp. v. Myrick,* 514 U.S. at 286–290, 115 S.Ct. 1483.

 Congressional intent is the ultimate touchstone of pre-emption analysis. *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). In considering whether pre-emption has occurred in a particular case, however, federalism concerns require a district court to proceed with caution so as to avoid unintended encroachment on the authority of the states. Thus, when a statute operates in an area traditionally governed by state law, pre-emption will not lie unless it is "the clear and manifest purpose of Congress." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

## C. The Dormant Commerce Clause

 Article I, Section 8, clause 3 of the United States Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes". The Commerce Clause, as it is known, "has long been seen as a limitation on state regulatory powers, as well as an affirmative grant of Congressional authority." *Fulton Corp. v. Faulkner,* 516 U.S. 325, 330, 116 S.Ct. 848, 853, 133 L.Ed.2d 796 (1996). The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce. *General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 818, 136 L.Ed.2d 761 (1997) (internal citations omitted). In its negative aspect, the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. *Id.* "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.,* 511 U.S. 383, 390, 114 S.Ct. 1677, 1682, 128 L.Ed.2d 399 (1994).

 In evaluating state regulatory measures under the dormant Commerce Clause, the Supreme Court has held that the first step is to determine whether the challenged action "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Fulton,* at 331, 116 S.Ct. at 854 (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1729, 60 L.Ed.2d 250 (1979)). State laws that discriminate against interstate commerce on their face are virtually *per se* invalid. *Id.* (citing *Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Or.,* 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994)). State laws that impose the same burden on both in-state and out-of-state interests, on the other hand, usually do not violate the Commerce Clause. *Georgia Manufactured Hous. Ass'n, Inc. v. Spalding County, Ga.,* 148 F.3d 1304, 1308 (11th Cir.1998). The activity challenged in this case is not alleged to be facially discriminatory. Nonetheless, a facially nondiscriminatory regulation may violate the

Commerce Clause in certain circumstances:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

## D. Federal regulation of aviation

It is undisputed that the federal government, through the Federal Aviation Act, 49 U.S.C. § 40101 *et seq.*, and elsewhere, has pre-empted certain areas related to aviation, both expressly and impliedly. State regulation of the airspace over the United States is forbidden by 49 U.S.C. § 40103(a), which declares that "The United States Government has exclusive sovereignty of airspace of the United States." Similarly, 49 U.S.C. § 41713(b)(1), titled "Preemption," establishes that "Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier [4] that may provide air transportation under this subpart." This express pre-emption is qualified by 49 U.S.C. § 41713(b)(3), which provides that subsec-

tion (b) does not limit a State or political subdivision of a state that operates an airport from carrying out its proprietary powers and rights.

Of particular concern in the instant case is the implied pre-emption of aviation noise control, recognized by the Supreme Court in *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). In that case, Burbank attempted to impose a ban, via a municipal ordinance, on jet takeoffs from the privately owned Hollywood Burbank Airport between 11 p.m. and 7 a.m. *Id.* at 625, 93 S.Ct. at 1856. The Supreme Court found that the "pervasive nature" of the scheme of federal regulation of aircraft noise—particularly the scheme resulting from the passage of the Noise Control Act of 1972—required a conclusion that the Federal Aviation Administration, in conjunction with the Environmental Protection Administration, "has full control over aircraft noise, pre-empting state and local control." *Id.* at 633, 93 S.Ct. at 1854. In striking down the ordinance, however, the Court emphasized that its decision applied only to local governments attempting to impose bans as an exercise of their police power, and that a different scenario would be presented if the government also operated the airport (which Burbank did not):

> [During Senate hearings on the 1972 Act, the] Secretary of Transportation also expressed the view that [the Act] "will not affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can

---

4. 49 U.S.C. § 40102(a)(2) defines "air carrier" as "a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation." "Air transporta-

tion" is defined by 49 U.S.C. § 40102(a)(5) as "foreign air transportation, interstate air transportation, or the transportation of mail by aircraft."

presently deny the use of their airports to aircraft on the basis of noise considerations as long as such exclusion is nondiscriminatory".... [W]e are concerned here not with an ordinance imposed by the City of Burbank as "proprietor" of the airport, but with the exercise of police power.... [A]uthority that a municipality may have as a landlord is not necessarily congruent with its police power. We do not consider here what limits, if any, apply to a municipality as a proprietor.

*Id.* at 635 n. 14, 93 S.Ct. at 1860 n. 14.

Congress has passed two additional Acts regulating the field of aviation noise control—The Aviation Safety and Noise Abatement Act ("ASNA") in 1979 and The Airport Noise and Capacity Act in 1990 ("ANCA")—that have some bearing on this case. ASNA, codified at 49 U.S.C. § 47501 *et seq.*, directs the Secretary of Transportation to establish "a single system of measuring noise" from aircraft operations and the exposure of individuals to that noise. 49 U.S.C. § 47502. The system is also required to identify land uses that are "normally compatible" with various levels of noise exposure. *Id.* ASNA also authorizes airport operators to prepare "noise exposure maps", based on the system mentioned above, that detail the noncompatible land uses around their airports. 49 U.S.C. § 47503. Once the airport operators have completed a noise exposure map, they may use it to prepare a noise compatibility program for Secretarial approval; if approved, the program entitles the airport operators to federal grants for measures intended to reduce noncompatible land uses, such as acquiring property in the too-noisy area. 49 U.S.C. § 47504. The noise compatibility program's measures may also include "restricting the use of the airport by a type or class of aircraft because of the noise characteristics of the aircraft." 49 U.S.C. § 47504(a)(2)(C). The FAA implements

ASNA through regulations found at 14 C.F.R. § 150 ("Part 150").

ANCA is codified at 49 U.S.C. § 47521 *et seq.* Within that Act, Congress directed the Secretary of Transportation to establish a national aviation noise policy, including a program "for reviewing airport noise and access restrictions on the operation of [S]tage 2 and [S]tage 3 aircraft." 49 U.S.C. § 47524(a). Pursuant to ANCA, an airport operator may only ban Stage 2 aircraft after giving the public 180 days' notice of (and opportunity to comment on) the proposed restriction, as well as the following: (1) an analysis of the anticipated or actual costs and benefits of the existing or proposed restriction; (2) a description of alternative restrictions; (3) a description of the alternative measures considered that do not involve aircraft restrictions; and (4) a comparison of the costs and benefits of the alternative measures to the costs and benefits of the proposed restriction. 49 U.S.C. § 47524(b). By way of comparison, a restriction on Stage 3 aircraft requires either an agreement by aircraft operators or approval by the Secretary. 49 U.S.C. § 47524(c)(1). Such approval requires that the Secretary find that the restriction is "reasonable, nonarbitrary, and nondiscriminatory" and not an unreasonable burden on interstate or foreign commerce, among other requirements. 49 U.S.C. § 47524(c)(2). ANCA imposes no such approval prerequisite upon an airport operator that want to restrict Stage 2 aircraft operations. *See* 49 U.S.C. § 47524. The FAA implements ANCA through regulations found at 14 C.F.R. § 161 ("Part 161").

III. *The Plaintiffs' Motion for Summary Judgment*

■ The Court now turns to the NBAA's argument in support of its motion for summary judgment. As best the

Court can tell, that argument goes something like this: To impose the restriction on Stage 2 aircraft, the Authority had to prepare a Part 161 study. Part 161 studies must be premised on a noise exposure map prepared in accordance with Part 150. Appendix A to Part 150 contains a compatibility table that details permitted and non-permitted uses [5] within specific noise level contours—65, 70, and 75 dB DNL.[6] Appendix A does not include a 60 dB DNL contour. Therefore, according to the NBAA, no airport operator can consider noise exposures at the 60 dB level in deciding whether to implement an access restriction.

This argument is not persuasive.

First, the Court notes that the Appendix A compatibility table *does* include a column for DNLs below 65 dB, which would include the 60 dB noise level considered by the Authority here. Thus, the NBAA's argument that "it's not listed, so it can't be considered" is without foundation. Even if the chart had failed to include DNLs below 65 dB, however, the argument would still fail, because of the absence of any language in the statutes or the regulations indicating that such a consideration is forbidden. If Congress or the FAA had intended to preclude local authorities from considering noise levels below 65 dB DNL in making an access restriction decision, either could easily have done so. They did not.

In addition, review of Appendix A makes it clear that it was not intended to prevent airport operators—governmental or private—from considering any particular noise impact or determining that a land use deemed acceptable by the FAA is un-

acceptable to local residents. *See, e.g.,* App. A, Sec. A150.101(d) ("For the purpose of compliance with this part, all land uses are considered to be compatible with noise levels less than [65 dB DNL]. *Local needs or values may dictate further delineation based on local requirements or determinations.*") (emphasis added) *and* App. A., Tbl. 1, fn(a) ("The designations contained in this table do not constitute a Federal determination that any use of land covered by the program is acceptable or unacceptable under Federal, State, or local law. The responsibility for determining the acceptable and permissible land uses and the relationship between specific properties and specific noise contours rests with the local authorities. *FAA determinations under Part 150 were not intended to substitute federally determined land uses for those determined to be appropriate by local authorities in response to locally determined needs and values in achieving noise compatible land uses.*") (emphasis added). The argument advanced by the NBAA would lead to precisely the result that the authors of Part 150 disavowed: imposition upon local authorities of a mandatory federal standard for making land use determinations. The NBAA cannot avoid the effects of the above-quoted provisions by focusing on "contours" rather than "land uses". The Plaintiffs' Motion for Summary Judgment must therefore be denied.

## IV. The Defendant's Motion for Summary Judgment

### A. Pre-emption

 As noted above, it is undisputed that the federal government has pre-empt-

---

**5.** The table actually identifies compatible and incompatible uses, not "permitted" and non-permitted uses. *See id.*

**6.** As an example, one can consult the Appendix A table—which has noise levels listed

across the top and different land uses down the side—and see that land use by "Nature exhibits and Zoos" is deemed incompatible with noise exposure in the 70–75 dB range, but compatible with noise exposure in the 65–70 dB range.

ed local regulation of certain areas related to aircraft noise, both expressly and by implication. *See, e.g.,* 49 U.S.C. § 40103(a) (expressly pre-empting, *inter alia,* local regulation of aircraft noise by regulating flight paths) *and City of Burbank,* 411 U.S. at 633, 93 S.Ct. at 1859–60 (concluding that "pervasive nature" of federal regulation impliedly pre-empts local control of aircraft noise). However, the Court concludes that the power exercised by the Authority in this case is not pre-empted.

ANCA, and more particularly 49 U.S.C. § 47524(b), expressly permits airport operators to ban Stage 2 aircraft, subject to certain requirements. The NBAA contends that these requirements include reasonableness and nondiscrimination, and that the Authority has not met those latter requirements, and that the ban is therefore pre-empted. But federal pre-emption is a limitation on state power, not the manner in which that power is exercised. If the Supremacy Clause prohibits a state from taking a particular action, it simply cannot do so, no matter how reasonable or rational that action might be.

Nonetheless, the NBAA insists that reasonableness and nondiscrimination are part of the pre-emption inquiry, and have been at least since the Supreme Court's *Burbank* decision. *See* Doc. 66 at page 3. Despite careful scrutiny of that case, the Court finds no such standard articulated. The closest instance occurs in the footnote in which the *Burbank* court describes the distinction between a municipality's noise-regulating authority under its police power and under its power as the proprietor of an airport. *Burbank* at 635 n. 14, 93 S.Ct. at 1861 n. 14. That footnote contains the following: "Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory." *Id.* In addition to failing to address "reasonableness," the

quoted text does not represent the opinion of the Supreme Court; instead, it comes from a letter submitted by the Secretary of Transportation to the Senate while it was considering a 1972 amendment to the Federal Aviation Act. *Id.* Thus, the *Burbank* case does not support the NBAA's contention that either the Supremacy Clause or the Commerce Clause imposes reasonableness or nondiscrimination requirements upon airport proprietors' efforts to ban aircraft.

Similarly, the cases cited by the NBAA as applying these requirements—primarily *National Helicopter Corp. of Am. v. City of N.Y.,* 137 F.3d 81, 90 (2d Cir.1998) and *British Airways Bd. v. Port Auth. of N.Y. and N.J.,* 558 F.2d 75, 84 (2d Cir.1977) (henceforth, *"Concorde I"*)—do not identify these requirements as arising from either of the two constitutional provisions the NBAA raises in the instant case. Instead, the case in which the Second Circuit Court of Appeals first identified these requirements—*Concorde I*—identifies those requirements as arising from a compact entered into by the Defendant Port Authority with the Secretary of Transportation. The compact required that John F. Kennedy Airport be "available for public use on fair and reasonable terms and without unjust discrimination." *Id.* at 85. Airport owners seeking funds to improve their facilities were required by statute to enter into such an agreement with the Secretary as a condition to having their grant applications approved. A similar requirement exists today, found at 49 U.S.C. § 47107(a)(1). The NBAA does not contend that the Authority violated any such compact.

However, the *Concorde I* decision can be read as also identifying the "reasonableness" requirement as one imposed by the Commerce Clause: "It is clear to us that the Port Authority is vested only with the

power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs. Any other conduct by an airport would frustrate the statutory scheme and unconstitutionally burden the commerce that Congress sought to foster." *Concorde I*, 558 F.2d at 84. Although the Second Circuit's analysis in *Concorde I* lacks detail and seems to blend Commerce Clause and Supremacy Clause considerations into one convoluted inquiry, at least one other Circuit appears to have accepted it. *See Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 103 (9th Cir.1981) (stating that "[t]he legislative history shows that Congress intended that municipal proprietors enact reasonable regulations to establish acceptable noise levels for airfields and their environs" and citing *Concorde I*). Therefore, the Court will address the NBAA's assertions that the Authority's ban is unreasonable or discriminatory and therefore pre-empted.

The NBAA argues that (1) some Stage 3 aircraft are as noisy or noisier at takeoff or landing than some Stage 2 aircraft; (2) Stage 2 aircraft operations at the Naples Municipal Airport are minimal and decreasing; (3) the Authority has adopted a variety of other measures to address noise concerns; (4) the expense incurred by Stage 2 operators and their vendors as a result of the ban would not be offset by increased property values within the 60 dB DNL contour; (5) resident noise complaints, which the Authority considered in imposing the ban, are subjective and not tied to the 60 dB DNL contour; (6) the FAA opposes the ban; and (7) the Authority has tried to retain scheduled airline service at the Naples Municipal Airport,

and has even considered seeking regional jet service.

The NBAA offers no explanation as to how these contentions, even if proven true, could lead the Court to conclude that the Stage 2 ban is unreasonable or discriminatory. None of these contentions controvert the Authority's position that it performed its study in conformity with the procedural requirements of 49 U.S.C. § 47524(b), Part 150 and Part 161. Nor do they controvert the essential finding of that study—that Stage 2 operations, though relatively minimal, account for a hugely disproportionate share of residents' noise complaints. However "unscientific" the NBAA might consider such complaints, there is nothing in the record that suggests they are an inappropriate consideration for an entity that is charged with assessing and addressing the noise problem at a particular airport. *See also Concorde I*, 558 F.2d at 85 ("Congress has reserved to proprietors the authority to enact reasonable noise regulations, as an exercise of ownership rights in the airport, because they are in a better position to assure the public weal.").

Similarly, even assuming the NBAA's asserted facts to be true, the fact that some noisier aircraft use (or may use) the airport or that other anti-noise measures have been taken in the past do nothing to establish that *this* particular anti-noise measure is unreasonable or discriminatory. The Court also finds no support for the NBAA's implied assertion that the financial harm caused by the ban must be offset by a dollar-for-dollar increase in local property values.[7] Furthermore, the alleged FAA opposition (which was based on informal letters from FAA employees, rather than an official agency determina-

---

7. The Court suspects this arises from the required analysis of "costs and benefits" of a proposed ban found in 49 U.S.C. § 47524(b). If so, the NBAA interprets "benefits" too narrowly.

tion) has no support in the record, as those letters have been excluded as hearsay. *See* Doc. 78, entered July 24, 2001. In any event, such opposition, standing alone, does nothing to establish unreasonableness or discrimination.

As for the other points raised by the NBAA to establish unreasonableness or discrimination, the Court has considered them and rejects them without further discussion. Accordingly, the Court concludes that the NBAA has failed to raise a genuine issue of material fact as to the reasonableness or nondiscriminatory nature of the Authority's ban on Stage 2 operations.

### B. Commerce Clause

 The NBAA does not explicitly contend that the Authority's actions run afoul of any of the traditional Commerce Clause restrictions. For example, nowhere in its brief does the NBAA claim that the access restriction discriminates against out-of-state economic interests in favor of in-state interests. *See* Doc. 66. Instead, the NBAA contends that the standard for analyzing the Authority's actions under the Commerce Clause is the same as it proposed for analysis under the Supremacy Clause—*i.e.,* that the actions must be reasonable and nondiscriminatory. As those arguments have been addressed above, they will not be repeated here. Moreover, the Court notes that Congress approved both the proprietor exception under which the Authority acted, *see* 49 U.S.C. § 41713(b)(3), and the process by which the Authority banned the remaining Stage 2 craft, *see* 49 U.S.C. § 47524. As a result, the actions taken by the Authority cannot violate the Commerce Clause. *See White v. Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed.2d 1 (1983)

("Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce."). *Accord, National Helicopter Corp.,* 137 F.3d at 91. Accordingly, the Court concludes that the NBAA has failed to raise a genuine issue of material fact as to whether the Authority's ban violates the Commerce Clause. The Authority is therefore entitled to summary judgment.

### V. *Conclusion*

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Summary Judgment (Doc. 32, filed June 18, 2001) is **DENIED,** and Defendant's Motion for Summary Judgment (Doc. 38, filed June 18, 2001) is **GRANTED.**

**DONE** and **ORDERED** in Orlando, Florida this ___ day of August, 2001.