Harry B. Frank, J.
This article 78 proceeding is brought by a local association of electrical contractors against various officials of the City of New York, including the Commissioner of the Department of Ports and Terminals, and against the Port of New York Authority, with regard to the manner of awarding contracts for the forthcoming construction work on a project known as the Consolidated Passenger Ship Terminal, located at Pier 88, North River, in the Borough of Manhattan.
Petitioner contends that contracts for the performance of any construction work on this project are “ public contracts ” which must comply with the procedures set forth in sections 101 and 103 of the General Municipal Law which, inter alia, require the preparation of separate specifications, and separate and independent bidding thereon, with respect to three specifically enumerated categories of construction work, one of which is “ electric wiring and standard illuminating fixtures ” (General Municipal Law, § 101, subd. 1, par. c), and petitioner seeks to enjoin the respondents from awarding, or acting under, any construction contract relating to the subject project which has not been let in compliance with such statutory mandate. More specifically, it is charged that these sections have, in fact, been violated in that bids on the project have been invited from general contractors, pn the basis of a single contract for the *861 entire construction instead of by means of separate bids on each of the categories delineated in section 101 and that a contract has been awarded, or will imminently be awarded, for the entire construction on such single bid basis. Petitioner asserts that by virtue of respondents’ failure to invite separate bids on the electrical work the members of its association have been wrongfully and unlawfully prevented from bidding on such work in violation of their rights under sections 101 and 103 of the General Municipal Law.
While it is conceded that the contract is being let by the Port Authority, as the lessee of the property involved, petitioner contends that the construction is nonetheless a city public work, subject to the statutes covering “ public contracts ”, by reason of the city’s ownership of the land on which the project is to be built as well as its extensive involvement in the financing of the $27,000,000 projetit, and that the lease to the Port Authority is merely a device or subterfuge to evade the separate letting statutes. If the contemplated construction is not-, in fact, a public project of the City of New York, the petitioner cannot prevail.
Crucial to a determination of the true nature of the project in issue is an understanding of the character and function of the Port Authority and the factual background which resulted in the proposed construction.
The Port Authority is a public agency created by an interstate compact between the States of New York and New Jersey and approved by Congress as required by the United States Constitution (L. 1921, ch. 154, § 1; N. J. Stat., § 32:1-1 et seq.; 42 U. S. Stat. 174; U. S. Const., art. I, § 10, 3d par.). It was created for “better co-ordination of the terminal, transportation and other facilities of commerce in, about and through the port of New York”. (L. 1921, ch. 154, § 1.) Its authority extends to the development of marine terminals, including piers and wharves, needed to facilitate commerce within the Port of New York district and in furtherance of its authority in that regard municipalities within the port district are authorized to co-operate with the Port Authority in the development of such marine terminals. The co-operation to be extended by the particular municipality includes the power to consent to the use by the Authority of any marine terminal or real or personal property owned by the municipality, as well as the authorization to grant, convey, lease or otherwise transfer such terminal or property to the Port Authority. (See L. 1921, ch. 154, § 1, art. VI; L. 1947, ch. 631, §§ 1-6, as amd.) The Authority which is statutorily defined to “ constitute a body, both corporate and *862 politic ” is specifically invested: “ with full power and authority to purchase, construct, lease and/or operate any terminal or transportation facility within such district; and to make charges for the use thereof; and for any of such purposes to own, hold, lease and/or operate real or personal property ” (L. 1921, ch. 154, § 1, art. VI). It may be noted that pursuant to -the compact and subsequent legislation, the Port Authority on behalf of the two member States owns or operates some 24 public terminal, transportation and other facilities within the port district, including six marine terminals.
In 1971, after a detailed study of the port district indicated the need for a modern marine terminal for waterborne passenger travel, the Port Authority entered into a lease agreement with the City of New York whereby the Port Authority leased various Hudson Riyer piers from the city and agreed to modernize such facilities and to exercise complete management, operation and control throughout the 20-year period of letting provided for in the lease. Extensive construction obligations are undertaken by the Port Authority and the lease provides that all construction contracts shall be let in its name.
In order to finance this extensive construction project, Port Authority and the city arrived at a financing formula contained in the lease and accompanying trust indenture. Under the arrangement, the costs of construction are to be initially advanced by the Port Authority and as work progresses these sums are to be paid by the city to the Port Authority which in turn has agreed to repay to the city, in the form of a guaranteed rental, the amount necessary to pay the principal and interest on the bonds sold by the city to raise the funds. If the revenues received by the Port Authority from users of the consolidated passenger vessel terminal prove to be inadequate to pay the guaranteed rental to the city, they are to be supplemented from the Port Authority’s treasury. The ultimate financial risk, therefore, rests upon the Port Authority.
Under the lease, the Port Authority is vested with right of control over the Terminal for 20 years with a right to renew for up to five years if during the initial term the Authority has not been able to secure revenq.es equal to the guaranteed rental it has repaid the city for construction.
In light of the purposes for which the Port Authority was created and the powers with which it is invested, there appears to be no merit to the petitioner’s contention that the lease .arrangement is merely a device to evade the separate letting statutes and that the project is, in fact, a public work of the *863 city. On the contrary, the Port Authority, a public body charged in its own right by the Legislatures of two States with the responsibility for providing adequate marine terminals for their bistate port, is here acting to accomplish its own public purposes in a manner authorized by the controlling legislation and: through statutorily contemplated co-operation with the City of New York.
The reliance which petitioner places upon the case of Empire Elec. Contrs. Assn. v. Fabber (71 Misc 2d 167) is misplaced. In that case, which dealt with the construction of the Brooklyn Terminal Market, the city leased the construction site to private developers, referred to as the Market, under a lease which provided that the developers would build certain buildings on the property for which they would be reimbursed by the city, that all improvements and buildings were to become the property of the city from their inception, and that the entire project was subject to the approval and control of the city. The court found that notwithstanding the mechanics of form whereby the market undertook the construction, the attending facts demonstrated that in substance it was a public project.
The facts in the present case, however, are clearly distinguishable from those in the Empire case. The Port Authority is not a private corporation merely acting as a nominal substitute to carry out a project that is in substance under the complete dominion and control of the city and for the city’s public purposes. Here, the Port Authority is itself a distinct public body charged with broad responsibility in the area of developing marine terminals in the port district. That the subject property is leased to the Port Authority, with the city retaining ownership, in no way alters the fact that the actual construction of the project is undertaken by the Authority pursuant to, and in furtherance of its own public purposes. Indeed, such lease arrangement is expressly authorized as one of the permissible avenues available to the Authority in carrying out its port development functions. Moreover, unlike the Empire case, in the instant situation the Port Authority, and not the city, will bear the ultimate cost of the construction of the terminal, even if such requires recourse to the Port Authority’s treasury. In addition, under the lease, the Port Authority, and not the city, has full control and direction over the construction project and full control, management and operation of the terminal during the at least 20-year terra of the lease. Also Unlike the situation in Empire, sole responsibility for preparation of the construction plans rests- with the Port Authority, *864 not the City Commissioner of Ports and Terminals, who is given merely a right of consultation and approval.
Under the facts here present it must be found that the marine terminal construction project is not a public work of the City of New York but is, in fact, a project of the Port Authority. As such, the contracts covering the construction of the project are not subject to the fragmented bidding procedures required under sections 101 and 103 of the General Municipal Law of the State. By virtue of its unique bistate character and its creation in “ authority” form, the Port Authority is invested with the ability to function with a freedom and flexibility not ordinarily permitted to a board or department of the State and it is able to carry on its operations free from restrictions otherwise applicable to the ordinary State or city board, department or commission. (See Matter of Ageson v. Catherwood, 26 N Y 2d 521; Matter of Plumbing, Heating, Piping & Air Conditioning Contrs. Assn. v. New York State Thruway Auth., 5 N Y 2d 420; Matter of New York Post Corp. v. Moses, 10 N Y 2d 199.)
While the foregoing conclusion necessarily requires a disposition in favor of the respondents, it further appears that the Port Authority would not, in any event, be subject to injunctive relief at the behest of a party such as petitioner. It can be enjoined without its consent only upon an action brought by the Attorney-General of New York or New Jersey. (See L. 1950, ch. 301, § 5; N. J. Stat., § 32:1-161; Matter of Lewis v. Lefkowitz, 32 Misc 2d 434, affd. 17 A D 2d 778; Cureton v. Port of N. Y. Auth., Sup. Ct., N. Y. County, Index No. 1519/72, decision dated Feb. 9, 1972.)
Accordingly, this application is denied and the petition dismissed.