OPINION OF THE COURT
Arthur D. Spatt, J.
Petitioner asks for the following relief:
(1) For an order restraining the Board of Trustees of Emma S. Clark Memorial Library (herein referred to as Library) from continuing the construction of the new wing of the Emma S. Clark Memorial Library; and
(2) For an order restraining the Three Village Central School District of Brookhaven and Smithtown (herein referred to as the School District) from making any further payments to the said Library.
Petitioner states that he is a property owner and taxpayer in the school district involved. That on May 9, 1978, a special meeting of voters in the school district was held to vote upon the annual budget proposed by the Board of Education for the general use and maintenance of the Library and to authorize the raising of said moneys by taxation in the district. This budget was approved by the voters of the district.
On or about January 15, 1979, the Library advertised for bids on the erection of a new wing for the Library. Petitioner states that the procedures herein by the School District and Library were illegal on the following grounds:
(1) One single bid was put out for a general contractor to do the entire job. Petitioner states that the advertised bid failed to comply with the provisions of section 101 of the General Municipal Law in that the Library failed to request separate bids for (a) plumbing and gas fittings, (b) steam heating, hot water heating, ventilating and air conditioning apparatus, and (c) electrical wiring and standard illuminating fixtures.
(2) The method of bidding was illegal in that the money for construction was being paid for by the taxpayers and, as such, *884 bids must be separately awarded for each of the above-named subdivisions of work.
(3) The procedures used by the respondents, therefore, constitute an illegal and unlawful diversion of public funds.
(4) The Library entered into a contract in contravention of the provisions of section 101 of the General Municipal Law (really the same as ground number one).
Respondents admit that the School District used public funds to finance the mortgage to be placed on the building by the Library. Respondents contend that the Library is a "free association library” under the provisions of subdivision 2 of section 253 of the Education Law. The School District entered into a contract with the Library many years ago. By the terms of this contract which was renewed from year to year, the Library was to provide library services to the School District residents pursuant to section 256 of the Education Law.
Respondents contend that section 101 of the General Municipal Law does not pertain to a free association library and only speaks of political subdivisions or school districts. Respondents contend that the Library is not a political subdivision as defined by section 100 of the General Municipal Law. Therefore, respondents say that the Library, being a free association library, is not bound by the separate bid mandates of section 101 of the General Municipal Law.
As an additional defense, respondents state that the petitioner really represents the interests of the National Electrical Contractors Association and that the General Municipal Law provisions are intended to protect the taxpayer or municipality as opposed to a private interest contractors’ association.
Finally, respondents make the public policy argument that a bidding by one general contractor results in obtaining a lower price than separate bidding which, it is contended, generates higher bid prices. So respondents contend, as a practical matter, utilization of the single bidding process will benefit the school district taxpayers.
THE LAW
The crucial issue here is whether the Library must comply with the provisions of section 101 of the General Municipal Law. To decide this issue, we must establish the *885 exact status of the Library as defined by the provisions of the Education Law.
Subdivision 2 of section 253 of the Education Law defines libraries as follows: "The term 'public’ library as used in this chapter shall be construed to mean a library, other than professional, technical or public school library, established for free public purposes by official action of a municipality or district or the legislature, where the whole interests belong to the public; the term 'association’ library shall be construed to mean a library established and controlled, in whole or in part, by a group of private individuals operating as an association, close corporation or as trustees under the provisions of a will or deed of trust; and the term 'free’ as applied to a library shall be construed to mean a library maintained for the benefit and free use on equal terms of all the people of the community in which the library is located.”
In this case, the Library was formed by a group of private individuals on July 6, 1891, for the purpose of "founding, continuing and perpetuating a library and to accomplish the formation of a society pursuant to said act for such purpose”.
Section 256 of the Education Law provides that a school district may grant money for the support of free association libraries provided such libraries are registered by the regents. In this case, the Library was registered by the Board of Regents of the State of New York on June 24, 1945.
It is further provided in section 256 of the Education Law that the school district may contract with the trustees of such free library registered by the regents "to furnish library services to the people of the municipality, district or reservation for whose benefit the contract is made”.
Pursuant to section 256 of the Education Law the School District has contracted with the Library from year to year for the providing of services to the residents of the School District (in the current contract, dated January 24, 1978, in paragraph 1, the Library agrees to provide library services to the residents of the School District in accordance with the provisions of section 256 of the Education Law, commencing July 1, 1977, and ending on June 30, 1978).
Section 256 of the Education Law also states as follows: "The amount agreed to be paid for such services under such contract shall be a charge upon the municipal or district bodies or tribal government * * * and shall be paid directly to *886 the treasurer of the free association library, or of the cooperative library system.”
In a vote held on May 9, 1978, the taxpayer-residents of the School District approved the contract with the Library for the 1978-1979 fiscal year; said contract providing for the payment to the Library of the amount sought by the Library. The 1978-1979 budget of the Library provided for a line item which represented financing charges on a mortgage of the Library’s property in order that the Library could undertake the construction project to expand its facilities in which we are involved herein.
Pursuant to subdivision 6 of section 226 of the Education Law, the trustees of the Library were authorized to mortgage their property as they shall deem proper for the best interests of the institution.
This approval by the electorate of the 1978-1979 budget containing a line item for mortgage carrying charges is a practice approved by the Commissioner of Education. (See Matter of Baasch, 10 Ed Dept Rep 194.)
Unlike its public library counterpart, this free association library is not permitted to float a bond to raise money, nor is it permitted to allow the school district to bond its debt. The method approved for the Library to finance a capital improvement is to mortgage the property. "There is no provision authorizing a school district or other governmental subdivision to issue bonds to obtain moneys [sic] for the support of a free association library. The trustees of a free association library would have the right to give notes, mortgages or other usual evidence of indebtedness.” (Ed Dept Law Div Letter, Jan. 17, 1956.)
The School District’s credit is in no way affected by the mortgage given by the Library on the Library’s property. "[PJrovide the basis for the legal authority for the appropriation of funds by a school district for the support of a library. There is no restriction in the statute as to the purpose for which money so appropriated may be used * * * I ñnd no merit in appellant’s argument that the execution of a mortgage by the trustees of the [association] library in some way encumbers the faith and credit of the school district * * * [TJhe library is a separate corporation and any obligation executed by it is the obligation of the corporation. Similarly, the act of the library corporation in the leasing or selling to the village * * * a portion of the proposed new building is the *887 act of a separate entity from the school district and so far as the record herein indicates, is not objectionable.” (Matter of Boyle, 7 Ed Dept Rep 102, 104-105; emphasis supplied.)
Another crucial issue raised by petitioner is his contention that the Library’s proposed expansion will be supported by tax dollars, which will be paid to the School District to cover the cost of mortgage financing. Petitioner reasons that because the money originated with "tax dollars”, the Library should have to comply with the mandates of section 101 of the General Municipal Law. This is not so.
The role of the School District actually is that of a conduit by which the Library receives payment of the budgeted amount approved by the electorate, which payment is received under the authority of sections 253 and 256 of the Education Law. The fact that the Library is supported by taxes by way of a contract with the School District is irrelevant to the matter of which political entities are bound by section 101 of the General Municipal Law. Subdivision 1 of section 101 of the General Municipal Law reads in part as follows: "Every officer, board or agency of a political subdivision or of any district therein * * * shall prepare separate specifications for the following three subdivisions of the work to be performed”.
This nonpublic, free association Library is not one of the specified entities controlled by the mandate of this statute.
For a definition of the term "political subdivision” we turn to subdivision 1 of section 100 of the General Municipal Law, which reads as follows: " 'Political subdivision’ means a municipal corporation, school district, district corporation and board of cooperative educational services.”
This nonpublic, free association Library is not named in the definition of "political subdivision” and is not a party or entity which is subject to the mandate of section 101 of the General Municipal Law.
Petitioner’s reliance on Empire Elec. Contrs. Assn. v Father (71 Misc 2d 167) is misplaced. In that case, dealing with the Brooklyn Terminal Cooperative Market, the City of New York owned the land; the City of New York paid for the cost of erecting the building and all improvements on the property; the City of New York owned the improvements on the land; the City of New York supervised the planning and building of the improvements:
"In the instant case, the City of New York, which is the *888 owner of the subject parcel of land, has entered into a lease with the Brooklyn Terminal Cooperative Market, Inc. The lease provides that the market will build certain buildings on the property for the conduct of its business, and will be reimbursed by the city for the costs of building. All improvements on the property, including all buildings, become the property of the city from their inception. The planning and construction of the buildings are to be under the supervision of the Commissioner of the city’s Department of Ports and Terminals.
"Additionally, the lease appears to envision compliance with section 101, since it provides that: 'Lessee shall award a general construction contract within fifteen (15) months from the date Lessee’s contract for architectural services is approved by Lessor. Lessee shall award all electrical, mechanical, sprinkler and heating, ventilating and air conditioning contracts within seventeen (17) months from the date Lessee’s contract for architectural services is approved by Lessor.’
* * *
"Respondents’ contention that the arrangement here does not fall within the purview of section 101 is also without merit. Although in form the construction is being undertaken by the market, the attending facts conclusively demonstrate that in substance it is a public project. The land belongs to the city; the buildings will belong to the city from the moment a spade touches the earth; the entire project is subject to the approval and control of the city; and, even though the payments to those constructing the buildings will be made by the market, the market is to be reimbursed by the city on a weekly basis for all such payments. * * *
"The construction here is in effect an act of the city, regardless of the mechanics or formalities employed. Section 101 of the General Municipal Law must therefore be complied with.” (71 Misc 2d, at pp 169-171.)
Here, in contrast, the Library owns the land; the Library will own the addition to the land; the Library will completely control the erection of the building and payments therefor and will end up owning and controlling everything.
Interestingly, in view of the allegation by respondents that the plaintiff’s attorney was representing the National Electrical Contractors Association, and its allegation in its affirmation dated March 23, 1979, at page 2, "upon information and belief, that the petitioner herein is associated with said associ *889 ation”, there is the case of Matter of New York City Ch., Inc. of Nat. Elec. Contrs. Assn. v Fabber (73 Misc 2d 859, affd 41 AD2d 821) involving the awarding of contracts by the Port of New York Authority for a project known as Consolidated Passenger Ship Terminals in the Borough of Manhattan. Petitioner therein likewise contended that the contracts for the performance of the construction work on this project were "public contracts” which must comply with the procedures set forth in sections 101 and 103 of the General Municipal Law which, inter alia, require the preparation of separate specifications and separate and independent bidding thereon. Petitioner therein also sought to enjoin the respondents from proceeding with the construction contract which had not been let in compliance with such statutory mandate.
In a well-written decision by Mr. Justice Harry B. Frank (Matter of New York Ch., Inc. of Nat. Elec. Contrs. Assn. v Fabber, supra), affirmed by the Appellate Division, First Department, the court denied the petitioner’s applications, stating in part (pp 863-864):
"The reliance which petitioner places upon the case of Empire Elec. Contrs. Assn. v Fabber (71 Misc 2d 167) is misplaced. In that case, which dealt with the construction of the Brooklyn Terminal Market, the city leased the construction site to private developers, referred to as the Market, under a lease which provided that the developers would build certain buildings on the property for which they would be reimbursed by the city, that all improvements and buildings were to become the property of the city from their inception, and that the entire project was subject to the approval and control of the city. The court found that notwithstanding the mechanics of form whereby the market undertook the construction, the attending facts demonstrated that in substance it was a public project.
"The facts in the present case, however, are clearly distinguishable from those in the Empire case. The Port Authority is not a private corporation merely acting as a nominal substitute to carry out a project that is in substance under the complete dominion and control of the city and for the city’s public purposes. Here, the Port Authority is itself a distinct public body charged with broad responsibility in the area of developing marine terminals in the port district. That the subject property is leased to the Port Authority, with the city retaining ownership, in no way alters the fact that the actual *890 construction of the project is undertaken by the Authority , pursuant to, and in furtherance of its own public purposes. In addition, under the lease, the Port Authority, and not the city, has full control and direction over the construction project and full control, management and operation of the terminal during the at least 20-year term of the lease. Also unlike the situation in Empire, sole responsibility for preparation of the construction plans rests with the Port Authority, not the City Commissioner of Ports and Terminals, who is given merely a right of consultation and approval.”
Petitioner herein further contends that section 1726 of the Education Law indicates a legislative intent that section 101 of the General Municipal Law should apply to this transaction. Not so. Section 1726 of the Education Law reads in part as follows:
"Lease and lease-purchase of buildings.
"1. Notwithstanding any inconsistent provision of law, the board of education of any union free school district may enter into agreements pursuant to the provisions of this section for the lease or lease-purchase of buildings for school purposes, to be placed or erected on a site owned by the district. * * *
"3. Such agreements shall be subject to the bidding requirements of the general municipal law, except that the provisions of section one hundred one of the general municipal law shall not apply to lease or lease-purchase of pre-manufactured items delivered to the site, but shall apply to installation and other work to be performed on the site.”
We are here not concerned with an agreement for the lease or lease-purchase of buildings for school purposes to be placed or erected on a site owned by the school district. Thus, section 1726 cannot be construed to require compliance by respondents with the dictates of section 101 of the General Municipal Law.
Further, section 1726 of the Education Law deals with a union free school district, not a free association library.
Also inapplicable herein is a case cited by petitioner, Matter of Liverpool Cent. School Dist. v Nyquist (55 AD2d 194), which involved a school district erecting an office building on its own property for school purposes.
Petitioner further contends in his brief that the procedures herein are in violation of section 1 of article VIII of the New York State Constitution, which reads in part as follows:
*891 "§ 1. [Gift or loan of property or credit of local subdivisions prohibited; exceptions for enumerated purposes]
"No county, city, town, village or school district shall give or loan any money or property to or in aid of any individual, or private corporation or association, or private undertaking, or become directly or indirectly the owner of stock in, or bonds of, any private corporation or association; nor shall any county, city, town, village or school district give or loan its credit to or in aid of any individual, or public or private corporation or association, or private undertaking, except that two or more such units may join together pursuant to law in providing any municipal facility, service, activity or undertaking which each of such units has the power to provide separately. Each such unit may be authorized by the legislature to contract joint or several indebtedness, pledge its or their faith and credit for the payment of such indebtedness for such joint undertaking and levy real estate or other authorized taxes or impose charges therefor subject to the provisions of this constitution otherwise restricting the power of such units to contract indebtedness or to levy taxes on real estate.”
Again, the court points out that this provision of the New York State Constitution involves a school district; involves the giving or loaning of its credit, and expressly permits, if authorized by the Legislature, certain contracts to pledge its faith and credit for the payment of certain indebtedness and authorizes it to levy real estate taxes. It is the opinion of the New York State Comptroller that a town, and therefore inferentially a school district, may contract to give moneys for the support of a free association library provided that such library is available to all the residents of the district, and such contract would not violate this provision of the New York State Constitution. "A town may grant moneys for the support of a free association library if the services provided by such library are available to and accessible by the residents of the town. Such appropriation must be held by town fiscal officer and paid out on duly authenticated vouchers under direction of the library trustees.” (23 Opns St Comp, 1967, p 684.)
Attention is also directed to Matter of Petker v City of New York (87 Misc 2d 534) wherein petitioners contended that the public library system in the City of New York was in violation of section 1 of article VIII of the Constitution of the State of New York. The court denied such application, stating as follows (p 537): "There is, however, a noteworthy distinction *892 between an allotment of public funds directly to the library system to finance its administration and contributing the same for the support of a free association library. In the same opinion, the Comptroller quotes from section 256 of the Education Law which provides 'Any authority named in section two hundred fifty-five may grant money for the support of free association libraries, provided such libraries are registered by the regents’. It is indicated that the Queens Borough Public Library has been registered by the Board of Regents. In other words, it is said that an appropriation by a municipal corporation or school district to a free association library as consideration for the maintenance of public library service cannot be a gift or donation within the meaning of this section. (Opn Counsel Ed Dept, 1951, 1 Ed Dept Rep 707.)”
Finally, the court is impressed with respondent’s argument that the provisions of sections 101 and 103 of the General Municipal Law are intended primarily for the protection of the taxpayers, and secondly municipalities as opposed to private interest contractor associations. "Clearly, these statutes have been construed for the benefit of taxpayers and not bidders, the guidepost being the public interest”. (Matter of Marino v Town of Ramapo, 68 Misc 2d 44, 52, a well-reasoned opn by Mr. Justice Morton B. Silberman.) (See Matter of General Bldg. Contrs. of N. Y. State v Board of Trustees, Vil. of Cayuga Hgts., 42 AD2d 660.)
The public policy of this State with regard to this type of contract is to "assure the prudent and economical use of public monies for the benefit of all the inhabitants of the state and to facilitate the acquisition of facilities * * * of maximum quality at the lowest possible cost.” (General Municipal Law, § 100-a.)
The attorney for the respondents states in his affirmation as follows:
"Ironically, the bidding procedures implemented by the respondent library board were for the benefit of the taxpayer; the contract which was awarded proves the point.
"It had been expected that the bids on the library addition would approximate $1,000,000. In fact, the lowest bid was $741,923; the next lowest bid being $781,000. It has been the experience in the private industry that the most cost-effective contracts are those which provide that the general contractor is wholly responsible for the entire job and is the entity which must provide for the completion of all work.”
*893 The memorandum from the New York State School Boards Association, attached to the respondent’s affirmation, deals with the subject of separate bidding, as follows: "Separate bidding of construction contracts generates higher bid prices, unnecessary delay in awarding contracts, and excessive difficulty in project coordination. Having the option of giving one general contractor overall responsibility for completion of the work would promote both administrative and cost effectiveness in local school districts. This practice has been customary in private industry for years and has proved very successful.”
Accordingly, petitioner’s applications are denied and his petition is dismissed.